FILED
2016 Apr-08  PM 03:02
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| KARIN WOODARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.2:14-cv-1794-TMP |
| | ) | |
| MEDSEEK, INC., | ) | |
| d/b/a Influence Health, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION and ORDER

This cause is before the court on the motion for summary judgment filed November 5, 2015, by the defendant, Medseek, Inc., which is now known as Influence Health.   Defendant seeks dismissal of all of plaintiff's claims arising from alleged discriminatory pay and from being laid off a few months after her maternity leave.   This matter has been fully briefed, and the court has considered the evidence and arguments set forth by both parties.   The parties have consented to the exercise of jurisdiction by the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

# I.   SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  Celotex, 477 U.S. at 322-23.  There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." Id. at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the

'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'"   Id. at 324 (quoting Fed. R. Civ. P. 56(e)).   The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings.   Celotex, 477 U.S. at 324.   "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."   Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(c).   The substantive law will identify which facts are material and which are irrelevant.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).   A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."   Id. at 248.   "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."   Id. at 249.   His guide is the same standard necessary to direct a verdict:   "whether the evidence presents a sufficient disagreement to require

3

submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983). However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor. Anderson, 477 U.S. at 255. The non-movant need not be given the benefit of every inference but only of every reasonable inference. Brown v. City of Clewiston, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## II.   FACTS

Viewing the evidence provided by both parties in the light most favorable to the nonmoving plaintiff, the following facts are considered for purposes of the defendant's motion for summary judgment.

### A.   Employment History

Defendant Influence Health is a healthcare technology company that provides software and technology services to healthcare marketers and medical clinicians. Plaintiff Karin Woodard[1] was hired by Influence Health on December 1, 2010, as Vice President, Information Technology/Management Information Systems, at an annual salary of $100,000.   She interviewed with Don Johnson, Kevin Badger, Doug Griffin, and Rose Jolly.   The defendant interviewed four other candidates for the position, and all of the other candidates were male.   The position given to Woodard was primarily for management of technical employees, but also to perform technical work.   In her position, Woodard was responsible for managing the Information Technology Department.

---

[1]       The Complaint lists the plaintiff's last name as Woodward, but subsequent filings, her deposition, and company records refer to her as Woodard.

During the first several months of her employment, she reported to Don Johnson.   In March 2011, she was reclassified as Vice President, Technical Services and Support.   With this transition, she took on additional IT-related responsibilities.   She also managed the project logistics and predictive analytics departments, and went from supervising seven employees to supervising 40.[2]   At that time, she began to report to Scott Cheney, Senior Vice President, Technology Services Organization.

In September 2011, Woodard began reporting to Jason Ingram, Senior Vice President, Consolidated Services.   On October 1, 2011, Woodard received a pay increase to $115,000, which represented an annual salary adjustment and her increased responsibilities, and which also reflected that she had performed well.   In December 2011, Ingram gave Woodard her first annual performance review.   He evaluated Woodard on 48 skills, rating her "distinguished" in 11 areas, "competent" in 30, and "marginal" in 7, for an overall rating of 3.08 out of a possible 5.   She asked for examples of reasons she got the low scores, but Ingram said he did not know of any.   He told her that he had been told to give her that score, and that the scores were on a curve, with her score being considered a good score.   Ingram noted

_____

[2]        Although the defendant disputes that Woodard supervised 40 employees, it does not dispute that her supervision duties expanded greatly, or that she supervised more people than the male comparator.

a number of Woodard's top strengths, as well as a number of development opportunities.

In the spring of 2012, Woodard began reporting to Marc Guthrie, Senior Vice President and Chief Technology Officer.   Guthrie prepared a second annual review of Woodard in the spring 2012, not long after he began supervising her.   He rated Woodard as "distinguished" in three areas, "competent" in 38, and "marginal" in 7, with an overall rating of 2.90 of a possible 5.   Woodard did not know about the review, and did see the review until February or March of 2013, when she told the human resources director that she had not received a review in 2012.   Only at that time did the human resources director share with Woodard the review done by Guthrie a year earlier.

Woodard became pregnant in 2012, and took maternity leave in early September of 2012.   She returned to work in October of 2012, and received a pay raise in December of 2012, which increased her salary to $117,300 annually.   Her pay was never decreased during the time she was employed with the defendant.

In March of 2013, CEO Peter Kuhn told a group of employees at a meeting that the layoffs were over.   Later that month, Woodard was laid off.

**B.   Employment Duties**

When Woodard began work with the defendant, the company was using a software product called SiteMaker, which was built upon the Microsoft.NET technology framework and included other key party solutions such as Adobe ColdFusion.   In 2010, the defendant began developing a product called Fulcrum, which is based on a Microsoft product known as SharePoint, a software platform that provides a content management system to store documents and share ideas. The defendant had been working with SharePoint for years before Woodard became employed, and employees working under her supervision continued to implement and manage SharePoint in Fulcrum and other applications.   When she was hired, Woodard was told that one reason she was hired was to develop a plan for hosting Fulcrum through SharePoint.   She developed the plan in its entirety.

Woodard also was given the task in 2011 of "migrating" the company's customers from SiteMaker to Fulcrum.   She recommended methods for handling the transition, and her recommendation was accepted by her supervisors.   Once Fulcrum was implemented, Woodard's team installed the SharePoint software when clients migrated to Fulcrum.   One group of employees would install the Fulcrum software, and then another group would configure it and build out the configuration. Woodard's team would then coordinate the process of taking the migration "live."

During this time, the company was growing quickly, and Woodard needed help in managing her group's role in installing SharePoint as part of creating Fulcrum for customers because she had other areas of responsibility.   Woodard had been interviewing people for more than a year prior to the summer of 2012 for help managing her employees with the installation of SharePoint in Fulcrum.   Guthrie was aware of the skills that Woodard and her team had.   Even so, Guthrie testified that in the summer of 2012, he did not believe that anyone on the defendant's staff had the necessary skill set to implement SharePoint.

A recruiter from defendant met Corey Milliman at a Sharepoint conference in the summer of 2012, and sent his resume to Guthrie and Woodard.   After interviews, Woodard recommended that Milliman be offered the position at a salary of $160,000 per year, with a bonus and relocation expenses, even though this salary was greater than her own.   Even though she recommended the hire and the salary, Woodard had long felt that she was underpaid, and she had raised the subject with her supervisors several times.

Milliman was hired because he would be able to oversee the SharePoint product, and because he was able to use his SharePoint knowledge to shoulder some of Woodard's work.   He also was hired to manage the operation of the product in

the data center, which was an operational role to manage the day-to-day implementation of the strategy that Woodard had developed.

### C.   Woodard's Employment and Pay

Silver Lake Sumeru, LP, ("Silver Lake") a technology investor, acquired Influence Health in June 2012.   Silver Lake told Influence Health that it had to cut certain dollar amounts to get the budget into a positive light.   Because the biggest expense at Influence Health was its staff, Johnson recommended layoffs to meet the Silver Lake budget cuts.   Influence Health laid off employees in September 2012 and March 2013. Woodard was not laid off in the first round of layoffs, which happened while she was on maternity leave.   In the March 2013 layoff, when Woodard's employment was terminated, Influence Health eliminated two vice president positions (one male and one female), four manager positions (three male and one female), and three director positions (one male and two female).   At that point all three females (Woodard, Suzanne Riccard, and Sharon Cox) working in a leadership role under Guthrie and Chief Operating Officer Ron Mullen were eliminated.

In general, layoff decisions were made after the defendant assessed whether it could combine or eliminate positions and still provide the same level of production and service.   Guthrie testified that he decided to terminate Woodard because she

lacked sufficient SharePoint knowledge and experience and she was not able "to stand up in front of a client ... and exude a level of confidence and capability that ... built confidence in the company."   His opinion was based upon his having heard her "getting flustered" when responding to customers' questions on the telephone. Woodard claims that she got only positive feedback from Guthrie until her termination, and that he told her when he terminated her that her work had been "fantastic" and that he would give her a "glowing" recommendation.

Woodard asserts that Guthrie discriminated against her after she became pregnant in that he excluded her from meetings and did not spend time with her like he did with other employees on her level.   She also stated that when Guthrie was hired, one of the first things he asked her was when her baby was due and how long she would be on maternity leave.   Although Woodard assigned all of her work to others on her team while she was on leave, Guthrie chose instead to have Milliman take Woodard's responsibilities while she was out, even though Milliman had worked at the company for less than a month.   While Woodard was on leave, Guthrie told Milliman that she was not coming back, although Woodard had stated that she would return, and she did.

Woodard claims that Daren McCormick, former Chief Operating Officer (prior to Ron Mullen), told her in December 2011 that she was being paid less than

her male counterparts and promised to increase her pay.   During Woodard's employment, the defendant classified her role as part of the support area of the Engineering and Technical Services group, and she was the only vice president in that support group.

Woodard asserts that Milliman, Groves Powers, Travis Moore, Michael Pittard, Garett Trumpower, Jeff Allegrezza, Michael Bermudez, Judson Englett, and Corbin Riemer performed work at Influence Health that was substantially similar to the work she performed, and that she was paid less than any of them.[3]   The defendant has stated that Trumpower and Moore were paid less than Woodard, and that Reimer and Englett were paid (at least in part) on a sales commission basis. Woodard did not participate in sales.   The only pay records produced demonstrate that Trumpower, who was a vice president, was paid $143,000 per year in 2010, significantly **more** than plaintiff's pay of $100,000 at that time; and that Moore, also a vice president,[4] was paid $135,000,[5] also more than plaintiff.   The records for

---

[3]      In response to an interrogatory, plaintiff identified John Asbeck and Scott Cheney, but plaintiff's response to the motion makes clear that plaintiff no longer asserts any claim as to Asbeck or Cheney, which is a concession that the two men are not alleged to be comparators.

[4]      In the management hierarchy of the defendant, the levels of rank in ascending order were manager, director, vice president, and senior vice president.   Directors were superior to managers, and vice presidents were superior to directors.

[5]      The pay chart provided as plaintiff's exhibit 3 does not indicate the year for which the salary is listed.   But, in any event, the highest rate of pay plaintiff received was $117,300.

Reimer indicate that, while he may have earned commissions on top of a base salary, his base salary in 2011 was $125,000, which exceeded plaintiff's pay by several thousand dollars.

As for Milliman, Woodard claims that she was qualified to and, in fact, performed all of the duties that were assigned to Milliman.   Pittard was Vice President of Engineering and supervised a team of software engineers writing programming for Fulcrum.   Bermudez was a manager-level engineer who oversaw one team of engineers.   Allegrezza was a director involved in product development. Both "manager" and "director" are titles below the level of vice president in the defendant's management hierarchy. Trumpower, a vice president; Powers, a director; and Riemer, a vice president, were customer consultants in the sales area. Moore was a vice president on the sales team, who later joined the product management team.   Influence Health pays its employees with sales responsibilities at least partly on a commission basis.

Woodard claims that in January 2012, former COO McCormick promised her a promotion with a pay raise upon completing a project.   The project was reassigned to another employee, Mike Oakman, before she was able to finish it. She further asserts that the defendant discriminated against her when she announced her pregnancy in April 2012 by removing 75 percent of her responsibilities and

assigning them to Oakman.   Woodard believes that McCormick, Ingram, Guthrie, and Mullen ignored her in 2012 after she became pregnant.

In early March of 2013, the CEO of Influence Health, Peter Kuhn, told employees that any terminations in the future would be based solely on performance. At the employee meeting, Woodard specifically asked Kuhn whether employees would be informed when their performance was lacking, and he told her that employees would be given a performance improvement plan and a chance to improve before they would be laid off.   Woodard asserts that she was not told that her performance was lacking, but was laid off soon after that meeting.

Woodard also was told by a co-employee that Rob Mullen said during a meeting with Guthrie and White that women don't belong in technical leadership positions, and that Mullen directed Guthrie to get rid of the women in those positions who reported to Mullen.   Plaintiff testified to the following in her deposition:

> Q. Further on in Defendant's Exhibit 7 on page six, it says he [Ron Mullen] was overheard by several employees as saying that women don't belong in technical leadership positions and directing Marc [Guthrie] to get rid of me for that reason.   Who were the several employees who overheard Mr. Mullen say that?
>
> A.   There were -- to my knowledge Marc Guthrie and Chris White.   I am not sure who else was in that meeting.
>
> Q.   Who told you about the meeting?

14

A.   Lisa Baugh.

Q.   Was Lisa Baugh in the meeting?

A.   No .

Q.   Tell me what Lisa Baugh told you about the meeting between Mr. Mullen, Mr. Guthrie and Mr. White.

* * *

Q.   What did Lisa tell you specifically that Mr. White said [to her about the meeting]?

A.   That he was -- first he is -- Rob [Mullen] was sort of loud and commanding and just generally not easy to get along with, that he had rubbed everybody the wrong way and then him saying that women don't belong in technical leadership positions, and specifically he was talking about the women reporting into his organization.   There were three women in leadership positions reporting up into Rob.

Q.   That is you and Sharon?

A.   And Suzanne.

Q. What else did Lisa tell you?

* * *

Q. Lisa told you that Chris said that Mullen said that women don't belong in technical leadership positions, correct?

A. Yes.

Q. Did Lisa say that Chris said that Mullen mentioned you specifically?

15

A.  I don't think so. I am not positive.  I don't remember the exact words of that conversation.

Q.  Did Lisa tell you that Chris said that Mullen told Marc to get rid of you for that reason?

A.  Yes.   Not me specifically, but them.

Q.  So Lisa said as part of this soliloquy with Mr. White, that part of that was that Mullen told White and Guthrie to get rid of them, meaning the woman in technical leadership positions?

A. Told Marc .

See Woodard's Depo. at pp. 121-123.[6]  The women under Mullen's supervision were Woodard, Sharon Cox, and Suzanne Riccard.   In March of 2013, when Woodard was told that her position was being eliminated as part of a reorganization and cost-cuttings, Cox and Riccard also were terminated.

Woodard filed her EEOC charge in June 2013, and filed her complaint commencing this lawsuit in September 2014.   She asserts that: (1) she was paid less than similarly-situated males, in violation of Title VII, on account of her gender; (2) she was paid less than males for substantially the same work, in violation of the

---

6       The defendant has not objected to this hearsay.   See Fed. R. Civ. P. 56(c)(2). Indeed, defendant offered that plaintiff's deposition testimony without redaction or limitation.

Equal Pay Act; and that (3) she was terminated, in violation of Title VII, on account of her gender.[7]

## III.   DISCUSSION

### A.   Claims Regarding Disparate Pay

Plaintiff bases her complaint on Title VII, 42 U.S.C. § 2000e, *et seq*., which prohibits discrimination in the workplace on the basis of race, sex, or national origin, and on the Equal Pay Act, 29 § U.S.C.A. 206(d).[8]   Title VII offers broad protection against disparate treatment on the basis of gender, while the Equal Pay Act focuses narrowly on the "specific practice of paying unequal wages for equal work." Miranda v. B & B Cash Grocery Store, Inc., 975 F.2d 1518, 1526 (11th Cir. 1992). In the instant case, plaintiff asserts that her job was terminated because of her gender, in violation of Title VII, and that she was discriminatorily paid less than males performing substantially similar work, in violation of both Title VII and the

---

[7]      Plaintiff has not alleged that her termination was in retaliation for her complaints that her pay violated Title VII or the Equal Pay Act, although she has testified that she did repeatedly tell her superiors that she did not think she was paid fairly.

[8]      In 1978, Congress passed the Pregnancy Discrimination Act ("PDA"), amending Title VII and providing that discrimination "because of sex" or "on the basis of sex" includes discrimination on the basis of pregnancy, childbirth, or related medical conditions.  42 U.S.C. § 2000e(k).   Since the passage of the PDA, it has been established that pregnancy discrimination claims are analyzed using the same framework as other Title VII sex discrimination claims.   See Armstrong v. Flowers Hospital, Inc., 33 F.3d 1308, 1312-13 (11th Cir. 1994).   Although plaintiff asserts that her treatment after she announced that she was pregnant was unfair, she offers that treatment as evidence of gender animus, and not as a discrete pregnancy-discrimination claim.

Equal Pay Act.  The defendant asserts that plaintiff has not produced substantial evidence to support her claims of discrimination, and that the real reason the plaintiff was terminated was because her poor work performance.  The defendant further asserts that plaintiff has failed to point to a valid male comparator who performed similar work and was paid more.

Under Title VII, a plaintiff asserting a disparate-treatment claim must prove that the defendant had a discriminatory intent either through direct or circumstantial evidence.  Denny v. City of Albany, 247 F.3d 1172, 1182 (11th Cir. 2001).  Direct evidence establishes that intent without the need for any inference or presumption. Id. (quoting Standard v. A.B.E.L. Servs. Inc., 161 F.3d 1318, 1330 (11th Cir. 1998)). Where there is no direct evidence, the plaintiff must prove intent in accordance with the method first set forth in McDonnel Douglas Corp. v. Green, 411 U.S. 792 (1973), and further refined in Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981).  Although proof of discriminatory intent is vital to a Title VII claim, that intent can sometimes "be inferred from the mere fact of differences in treatment."  International Brotherhood of Teamsters v. United States, 431 U.S. 3245, 335 n.15, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1997).

The same burden-shifting scheme applies to cases involving circumstantial evidence of a violation of the Equal Pay Act ("EPA").   <u>Miranda</u>, 975 F.2d at 1530.   The proof of intent, however, is not required to state a *prima facie* case under the EPA.

### 1.   Equal Pay Act

Under the Equal Pay Act, a plaintiff must prove that he or she performed substantially similar work for less pay than employees of the other gender.   The Supreme Court applying the Equal Pay Act has required a showing that the employer pays "different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort and responsibility, and which are performed under similar working conditions.' "   <u>Corning Glass Works v. Brennan</u>, 417 U.S. 188, 195, 94 S. Ct. 2223, 41 L. Ed. 2d 1 (1974).   The duties performed need not be identical but merely "substantially equal."   <u>Brennan v. City Stores</u>, 479 F.2d 235, 238-39 (5th Cir. 1973).[9]   A comparator's prior experience in not relevant to the inquiry, but only the "skills and qualifications actually needed to perform the jobs."   <u>Mulhall v. Advance Sec., Inc.</u>, 19 F.3d 586, 592 (11th Cir. 1994).   Similarly, a job title may be a "factor for consideration," but it is not

---

[9]      Decisions of the Fifth Circuit Court of Appeals entered before the close of business on September 30, 1981, are binding as precedent on the Eleventh Circuit Court of Appeals. <u>Bonner v. City of Prichard, Ala.</u>, 661 F.2d 1206 (1981).

dispositive.   19 F.3d at 592.   Once the plaintiff makes this showing, the burden

falls to the employer to prove an affirmative defense available under the statute.[10]

Under Title VII of the Civil Rights Act, the standard of "similarity" is less

strict, but a plaintiff also must offer evidence of an intent to discriminate.   Miranda,

975 F.2d at 1526.   The same affirmative defenses that apply to the EPA can be

brought in a Title VII discriminatory-pay case based upon the Bennett Amendment

to Title VII.   42 U.S.C. § 2000e-2(h); see Washington County v. Gunther, 452 U.S.

161, 167, 101 S. Ct. 2242 (1981).

In this case, Woodard has provided direct evidence of Equal Pay Act

discrimination and, therefore, need not rely on the McDonnell Douglas

burden-shifting framework to demonstrate that she was paid less than her

counterparts, all of whom were male.   Woodard has stated that she was told by

Daren McCormick, then her supervisor, that she was paid less than her counterparts.

---

[10]     The relevant portion of the Equal Pay Act, 29 U.S.C. § 206(d)(1), provides:

No employer having employees subject to any provisions of this section shall
discriminate, within any establishment in which such employees are employed,
between employees on the basis of sex by paying wages to employees in such
establishment at a rate less than the rate at which he pays wages to employees of the
opposite sex in such establishment for equal work on jobs the performance of
which requires equal skill, effort, and responsibility, and which are performed
under similar working conditions, except where such payment is made pursuant to
(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by
quantity or quality of production; or (iv) a differential based on any factor other
than sex....

She further has testified that McCormick promised her an increase in pay to erase the difference, which she never received.  Therefore, even without any direct or circumstantial evidence that the defendant intended to discriminate, she has made a *prima facie* showing under the Equal Pay Act.[11]

To further support her pay claim, Woodard has demonstrated that other vice presidents, all of whom are male (and even some managers and directors who rank lower in the hierarchy than vice president) were paid more than was she.  Corey Milliman, who was hired in a role of lesser responsibility, but with substantially similar skills, was brought in at $160,000 at a time when she was paid less than $120,000.  He was paid more than she was paid, even when he was new to the company and reported directly to her and she had several years of seniority to him. Although the defendant argues that Milliman had more experience with SharePoint, the court finds that there are genuine issues of fact as to whether Milliman and Woodard had jobs requiring equal skill, effort, and responsibility, and that those jobs were performed under similar working conditions.[12]   While it is true that there was

---

[11]     McCormick denies making that statement, but the defendant concedes that, for purposes of the instant motion, it is accepted as fact.

[12]     Because the court finds that Milliman is a sufficient comparator under the EPA, the court need not determine whether the other male vice presidents, managers, and directors cited by the plaintiff also are comparators because even a single comparator is sufficient to withstand the defendant's motion for summary judgment.

no other officer in the company with the exact title and duties as Woodard, that alone does not defeat her claim of pay discrimination under the EPA.[13]   See Mulhall, 19 F.3d at 592.   As the Eleventh Circuit noted in Miranda, it is important that the standard employed in evaluating pay claims does not "shield employers who significantly underpay women but seek to avoid the requirements of the Equal Pay Act by changing the job description in a slight way that does not affect the substance of the responsibilities."   975 F.2d at 1531.

Under the EPA, to rebut a *prima facie* showing, the defendant bears the burden of proving that the pay differential is justified by one of the four statutory defenses.   In this case, the defendant has failed to assert that Woodard's pay was subject to a merit or seniority system, was measured by a quantity or quality of production, or was otherwise subject to some nondiscriminatory factor.   The defendant's arguments that Guthrie believed that Woodard was not as effective or as skillful as Milliman are not the type of specific showing of cause that is anticipated by the EPA.   The *prima facie* showing turns upon the "jobs held" and not the "skills

---

[13]      To require that each plaintiff find an identical comparator would effectively preclude any such action by a high-ranking employee – of whom there are necessarily fewer than lower-level workers, and would restrict the remedies of the equal pay legislation to those who work at less specialized jobs, such as assembly line workers or retail clerks.   Comparing substantial similarity of management skills, responsibilities, and requirements among higher-level employees is just as possible as comparing the job requirements of lower-level employees.

and qualifications of the individual employees holding those jobs." Mulhall, 19 F.3d at 594, quoting Brock v. Georgia Southwestern College, 765 F.2d 1026, 1032 (11th Cir. 1985).   The Eleventh Circuit Court of Appeals has described the defendant's burden as a "heavy one" because the defendant "must show that the factor of sex provided *no basis* for the wage differential."   Irby v. Bittick, 44 F.3d 949,  954 (11th Cir. 1995), quoting Mulhall v. Advance Sec., Inc., 19 F.3d 586, 589-90 (11th Cir.), cert. denied, 513 U.S. 919 (1994).[14]   In contrast to an action alleging unequal pay under Title VII, an EPA plaintiff does not carry the burden of disproving the defendant's reason, or showing that the asserted reason is pretextual. See, *e.g.*, Buntin v. Breathitt County Bd. of Educ., 134 F.3d 796, 799 (6th Cir. 1998). Rather, the employer must affirmatively prove the applicability of a statutory defense.

Given all of the facts set forth by the plaintiff, a reasonable juror could infer that Woodard's position and Milliman's position[15] were substantially similar for purposes of the EPA.   Defendant has failed to demonstrate by sufficient evidence

---

[14]    To the extent that defendant may argue that Milliman's salary was higher than plaintiff's because his previous salary was high (and it thus took a higher salary to gain his acceptance of the job) is insufficent.   The Eleventh Circuit Court of Appeals has expressly noted that "prior salary can never be used by an employer to establish pay," because using a male's prior high salary simply perpetuates the inequality that the EPA was enacted to rectify.   Irby, 44 F.3d at 956.

[15]    The court's focus on the comparison between plaintiff and Milliman is not intended to limit the plaintiff's proof at trial that there are other comparators as well.

that the pay disparity was on account of one of the four permissible reasons set forth in the EPA.   Accordingly, the defendant's motion for summary judgment on plaintiff's Equal Pay Act claim is due to be denied.

### 2. Title VII Disparate Pay

Under Eleventh Circuit law, the burden of showing the similarity of work performed by a female plaintiff and a male comparator is "more relaxed" under Title VII than under the EPA.   See Rollins v. Alabama Comm. College Sys., 814 F. Supp. 2d 1250, 1267 (M.D. Ala. 2011).

The same evidence that supports her EPA claim suffices to support a Title VII claim that Woodard was discriminatorily paid.   The element of intent can be satisfied by other evidence offered by the plaintiff, such as evidence that she was told she was paid less than her counterparts, and evidence that she was told she would get a promotion and higher pay when she finished a project, but that she was never allowed to finish the project because it was reassigned.[16]   Finally, Woodard has offered evidence, albeit in the form of hearsay, that Mullen, then the COO at Influence Health, told Guthrie, plaintiff's supervisor, that women did not belong in

---

[16]     The court agrees with the defendant's argument that no failure-to-promote claim can be raised at this juncture based upon McCormick's alleged promise made in January 2012; however the allegations still may be considered as evidence regarding the defendant's intent with respect to the disparate-pay claim.

technical leadership positions and that Guthrie should get rid of them.   After that statement was allegedly made, Guthrie laid off the plaintiff and two other women in supervisory positions.   Accordingly, Woodard has carried her initial burden of establishing a *prima facie* case of discrimination in pay.   McDonnell Douglas, 411 U.S. at 802.   Then, unlike in an Equal Pay Act claim, the burden shifts, and the defendant must "articulate some legitimate, nondiscriminatory reason" for the pay discrepancy.   Id.   If a nondiscriminatory reason is articulated, the plaintiff may attempt to show that the proferred reason was merely a pretext, and that the employer's intent was discriminatory.   See Burdine, 450 U.S. at 253.

Influence Health asserts that it paid Woodard less than Milliman because he had a broader range of knowledge in SharePoint and had good contacts within Microsoft.   The defendant's articulation of a legitimate, non-discriminatory reason for the pay differential shifts the burden to plaintiff to show that the reason either is not worthy of belief, or that, in the light of all the evidence, a discriminatory reason more likely motivated the decision than the proffered reason.   Standard v. A.B.E.L. Servs. Inc., 161 F.3d 1318, 1331-33 (11th Cir. 1998).   Because Woodard has offered evidence (1) that the defendant knew that Woodard was being paid less than similarly-situated males, as she was told by McCormick, (2) that the defendant promised to rectify the pay disparity but did not, (3) that the COO said he did not

believe women deserved positions such as hers, (4) that Woodard also had extensive experience working with SharePoint, (5) that she had successfully managed over forty subordinate employees, and (6) her work was described as "fantastic," plaintiff has met her burden of producing evidence sufficient to allow a reasonable juror to find that Influence Health's reason for paying Milliman more than plaintiff is not worthy of belief, or that a discriminatory reason more likely motivated the decision to pay Woodard less than her comparator.   Accordingly, the motion for summary judgment as to the Title VII disparate pay claim also is due to be denied.

### B.   Title VII Termination Claim

Plaintiff's final claim is that she was terminated on account of her gender during a reduction in force in March 2013.   A plaintiff can establish a *prima facie* case of discrimination in a reduction-in-force case by showing that: (1) she was a member of a protected group and was adversely affected by an employment decision; (2) she was qualified for the position or another position when she was laid off, and (3) there exists evidence of an intent to discriminate.   Lawver v. Hillcrest Hospice, Inc., 300 Fed. App'x 768, 772-73 (11th Cir. 2008).   Reduction-in-force cases generally involve instances in which the plaintiff was not replaced by another employee.    300 Fed. App'x at 773, citing Mauter v. Hardy Corp., 825 F.2d 1554, 1557 (11th Cir. 1987).

In this case, there is no dispute that the plaintiff was in the protected group, as a woman, and that she was adversely affected by the decision to terminate her employment.   Defendant further does not argue that Woodard was not qualified to do the job or another job at the time.   Instead, the defendant argues that the "decision had nothing to do with sex; it had to do with Influence Health's perception of Plaintiff's and Milliman's respective skills and experience and its need to reduce overhead."  (Doc. 23, p. 18).   While it is well settled that it is not the job of the court to second-guess an employer's evaluation of its employees' skills and abilities, this argument completely ignores the direct evidence of sex discrimination: that Mullen said he did not want women in technical management leadership positions, and that she was intentionally paid less than male counterparts.   In addition to that evidence, the plaintiff has testified that she was treated differently by Guthrie after she became pregnant, and that Guthrie described her work as "fantastic" and promised to give her a "glowing" review when she was terminated.   Both Guthrie and Mullen were decision-makers with regard to the reduction in force. These facts could, if believed, persuade a reasonable juror that Woodard was laid off not because of financial reasons or Milliman's qualifications, but because she was female.

Sufficient evidence exists to allow a reasonable juror to determine a discriminatory reason more likely motivated the decision to terminate Woodard than

the nondiscriminatory reason provided by Influence Health. Accordingly, the motion for summary judgment is due to be denied.

## IV.   CONCLUSION

Accordingly, consistent with the foregoing discussion of the evidence presented and the law governing this action, this court determines that Influence Health's motion for summary judgment (doc. 20) against Woodard is due to be DENIED.

Dated the 8th day of April, 2016.

_____
T. MICHAEL PUTNAM
UNITED STATES MAGISTRATE JUDGE